**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0046n.06
Filed: January 18, 2005

No. 03-3357

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| TERRY L. LUCAS, Jr., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| PHILIP A. CHANCE, JEFFREY | ) | NORTHERN DISTRICT OF OHIO |
| CHANCE, and MAHONING COUNTY, | ) | |
| OHIO, | ) | |
| | ) | |
| Defendants | ) | |

BEFORE:    MERRITT, MOORE, and GILMAN, Circuit Judges.

**MERRITT, Circuit Judge.**  This is a § 1983 case raising a First Amendment claim

against municipal officials and a municipality.  It is an appeal from a summary judgment in favor

of defendants.  The main legal question involves the admissibility of hearsay evidence in

opposition to a motion for summary judgment.

Plaintiff Terry Lucas ("Lucas") was hired by Sheriff Edward Nemeth ("Nemeth") in

1993 as a deputy sheriff for Mahoning County, Ohio.  Nemeth faced re-election in 1996 and

Lucas campaigned in support of him during his primary race against Phillip Chance, a defendant

in this case.  Lucas's campaigning on behalf of Nemeth included talking with people about the

election, placing signs in his yard and the yards of several family members, purchasing two

-1-

tickets for a Nemeth fundraising event and wearing a pro-Nemeth pin when off-duty.

Jeffrey Chance, a co-defendant in this case, served as a deputy sheriff with Lucas while his brother Phillip was running for Sheriff. According to Lucas, he was friends with Jeffrey, who tried to convince Lucas to vote for his brother by telling him to choose the "right team." In his deposition, Lucas stated that he considered this to be an implied threat.

In spite of Lucas's efforts on his behalf, Nemeth lost the primary to Philip Chance. For the general election, Lucas supported Randall Wellington, Phillip Chance's opponent, and conducted limited campaigning on his behalf, primarily consisting of placing a few yard signs. In response to this round of campaigning, Lucas claims that Jeffrey Chance again asked him to support his brother's election and that to support Wellington was to choose the "wrong team."

Several months after Phillip Chance won the general election and was installed as the new Sheriff, he transferred Lucas from his assignment at the Youngstown Metropolitan Housing Authority to a posting at the county jail. Lucas claims that Jeffrey Chance told him the transfer to a less prestigious position was in retaliation for his political speech against his brother Phillip. There is no indication that this transfer resulted in a decrease in salary or other benefits.

In September 1998 a special grand jury empaneled to investigate fraud and corruption in the tri-county area indicted Lucas on charges that he stole money from several individuals arrested on drug charges. On July 14, 1999, prior to trial and at the prosecutor's request, the state court dismissed all charges against Lucas without prejudice.

On July 12, 2001, Lucas filed a § 1983 suit against the Chance brothers, three other local government officials, and the County itself. All defendants except the Chance brothers and the County have been dismissed from the case. Lucas claims that the remaining defendants

conspired with various criminal defendants to manufacture the charges against him and to influence the prosecutor to seek an indictment. The only evidence that he provides in support of this claim are his own reports of conversations he had with various parties about his indictments. In these conversations Lucas was allegedly told about back-room deals made between the Chances and their agents and several criminal defendants, who were promised favorable treatment in exchange for their perjured testimony against Lucas.[1]

Unrelated to the allegations in this case, Phillip Chance was found guilty on federal bribery charges and linked in the media to organized crime. He is currently serving his sentence in a federal prison in New York. While these facts may lend some credence to Lucas's allegations, they do not change his burden of proof or the rules of evidence.

---

[1]Lucas's Brief describes these contacts as follows

One of the charges in the indictment against Lucas was that Lucas had kept [$2500] confiscated in a raid against Harold Lothard ("Lothard"). An attorney named Paul Gambrel ("Gambrel") represented Lothard. Gambrel told Lucas that Jeffrey Chance had approached Lothard. Gambrel also told Lucas that Jeffrey Chance had instructed Lothard to approach a probation officer and assert that Lucas had participated in the theft of the [$2500].

Another charge in the indictment was that Lucas was involved in taking money from an arrestee, Nicholas Fusco ("Fusco"). Robert Ruggeri, a special prosecutor, told Lucas that Mahoning County Deputies Parise and Farina had visited Fusco in prison before Fusco made allegations of criminal conduct by Lucas. Deputies Parise and Farina were close associates of Sheriff Philip Chance. Lucas reasoned that Philip Chance had dispatched Deputies Parise and Farina to speak to Fusco in prison. Farina also spoke to an individual named Billy Aaron ("Aaron"). Farina instructed Aaron to make allegations against Lucas. Farina advised Aaron that in return for allegations of criminal conduct against Lucas Aaron would receive help relating to criminal charges then pending against Aaron. Aaron's brother told Lucas about Farina's approach to Aaron.

Lucas Br. at 7-8 (citations omitted).

-3-

The magistrate judge identified the three elements of a First Amendment retaliation claim as (1) the plaintiff engaged in protected conduct, (2) the plaintiff suffered an adverse action that would deter a person of ordinary firmness from continuing in that conduct, and (3) a causal connection existed between the first two elements, or in other words, the adverse action was at least in part motivated by the plaintiff's protected conduct. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). For purposes of opposing a motion for summary judgment, the magistrate ruled that Lucas was successful with respect to the first two elements. However, the only evidence he offered in support of the third element was inadmissible hearsay. The magistrate correctly found that only admissible evidence can be used to oppose a motion for summary judgment and therefore ruled in favor of the defendants.

It is well-established in this circuit that otherwise inadmissible hearsay evidence may not be used to support or oppose a motion for summary judgment.[2] *See Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003) ("If the [offered] comments are deemed to be hearsay, then the evidence could not be considered on summary judgment."); *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994) ("[H]earsay evidence cannot be considered on a motion for summary judgment."). This rule is grounded in the language of Rule 56(e), which states "[s]upporting and opposing affidavits [related to a motion for summary judgment] shall be made on personal knowledge, shall set forth such facts *as would be admissible in evidence*, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e) (emphasis added).

---

[2]Lucas effectively concedes this point by failing to contest it in his brief. He argues only that the evidence he offers falls within an exception to the hearsay rule, not that inadmissible hearsay may be considered on summary judgment.

In response, Lucas argues that the asserted testimony falls within one of the hearsay exceptions found in Rule 804 of the Federal Rules of Evidence. Under Rule 804, if a declarant is unavailable as a witness, then additional hearsay exceptions may apply to that declarant's statements. These include his former testimony, statements made under belief of impending death, statements made against interest, and statements made regarding personal or family history.

Lucas erroneously argues in his brief that the three declarants are unavailable, under Rule 805(a)(5), because they "are highly unlikely to make themselves available to appellant to testify in a civil case such as this one." Lucas Br. at 11. But the rules require more than merely asserting a high probability of uncooperativeness for the exception to apply. "'Unavailability as a witness includes situations in which the declarant . . . is absent from the hearing *and proponent of a statement has been unable to procure the declarant's . . . attendance or testimony . . .* by process or other reasonable means." Fed. R. Evid. 804(a)(5) (emphasis added). There is no evidence in the record that Lucas has made any effort whatsoever to "procure the declarants' testimony." Instead he merely asserts the belief that the declarants would not make themselves available if he were to make such an effort. One purpose of the subpoena power is to require the cooperation of witnesses who would otherwise prefer not to be subjected to the rigors of the adversarial process. Lucas argues that a proponent of hearsay need not utilize this power of the court if he believes it will ultimately prove ineffectual. Lucas has offered no support for this position in the case law or otherwise. "Unavailability" does not mean that a witness may be hostile or reluctant. The language of the rule "attendance or testimony . . . by process" means what it says.

Finally, since Lucas has failed to offer admissible evidence of any First Amendment violation, he cannot prove liability for the County. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Accordingly we AFFIRM the summary judgment entered by the district court.